Argued and submitted July 24, affirmed in part, reversed and remanded in part
September 23, reconsideration denied November 6, petition for review denied
December 2, 1987 (304 Or 437)

# ROACH,
*Appellant,*

*v.*

# KELLY HEALTH CARE, INC. et al,
*Respondents.*

## (A8411-06671; CA A40352)

742 P2d 1190

496

Richard S. Gleason, Portland, argued the cause for appellant. With him on the briefs was Stoel, Rives, Boley, Fraser & Wyse, Portland.

Susan E. Watts, Portland, argued the cause for respondents. With her on the brief were George W. McKallip, Jr., and Kennedy, King & Zimmer, Portland.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

Plaintiff appeals a judgment for defendants in this survival action. ORS 30.075. Plaintiff sought damages for personal injuries that Edna Tuson (Tuson), plaintiff's decedent, sustained in her home while under the care of defendant Kelly Health Care, Inc. (Kelly). Plaintiff contends that the trial court erred when it granted Kelly's motion for a directed verdict against several negligence *per se* allegations, improperly instructed the jury on the one negligence *per se* allegation that it did not dismiss and erred in several other respects. We hold that the court's resolution of the negligence *per se* allegations was erroneous and reverse as to Kelly.[1]

In October, 1983, Tuson, an 87-year-old widow, lived at home by herself in Portland. Early that month Mrs. Blaufus, her daughter, noticed signs of forgetfulness and confusion in Tuson. Blaufus arranged for the Visiting Nurses Association (VNA) to provide home nursing visits several times a week to ensure that Tuson was taking her medication and to monitor her blood pressure. On two occasions in early November, Tuson fell at home and was unable to get up until a visitor discovered her. After the second fall, Blaufus took Tuson to her home, but after several days she insisted on returning home.

On November 17, a VNA nurse found Tuson obviously confused and showing signs of a stroke, which was confirmed by her doctor. Blaufus arranged for Kelly to provide 24-hour live-in care for Tuson. As was its normal practice in such cases, Kelly used certified nursing assistants (CNAs) rather than home health aides (HHAs) to provide the care. CNAs receive 60 hours of training, with an emphasis on caring for patients in an institutional setting under the direct supervision of a nurse. HHAs receive an additional 60 hours of training, with emphasis on home care, including attention to home safety.

Kelly employes began living with Tuson at the end of November. Her condition deteriorated gradually. She became less aware of her surroundings and less able to care for herself. She also developed bedsores. One sore on her coccyx did not

---

[1] Plaintiff makes no assignments of error relating to Kelly Services, Inc., and we therefore affirm as to that defendant.

heal. On January 5, 1984, defendant Gray, Kelly's nursing supervisor, visited Tuson in her home; Blaufus was also present. Gray's visit was partly to determine Tuson's competency for a conservatorship proceeding and partly to conduct a regular supervisory inspection. She discovered that the sore on the coccyx was worse. Blaufus took Tuson to a physician, who changed the treatment for the sores by instructing the CNA on duty to turn Tuson every two hours. The CNA believed that he intended her to do so throughout the night as well as during the day. She turned Tuson every two hours until 6:30 the next morning, when the aide went to sleep and did not wake until 11:30 a.m. When she went into Tuson's room, she found her on the floor with her face against a baseboard heater, severely burned. Tuson was hospitalized for more than two weeks and then stayed in a nursing home until her death from other causes in July, 1984.

In her fourth amended complaint, plaintiff alleged common law negligence claims against Kelly, based on the CNA's actions, and against Gray for alleged failures in supervision of the CNA and of the placement of CNAs in the home. Plaintiff also alleged a number of negligence *per se* claims against Kelly based on violations of administrative rules governing home health agencies. The trial court granted Gray a directed verdict and dismissed all but one of the negligence *per se* allegations against Kelly on the ground that the evidence did not show a causal connection between the alleged rule violations and Tuson's injury. The jury found for defendant. Plaintiff contends that there was evidence to support all of the negligence *per se* allegations; defendants, by cross-assignments of error,[2] assert that the rules do not apply to Kelly's actions. We turn to the statutes and the rules governing Kelly's responsibilities and to its role in this case.

Under ORS 443.005 to ORS 443.095,[3] a home health agency must be licensed, if it is primarily engaged in providing

---

[2] A party may make a cross-assignment of error without filing a cross-appeal when the cross-assignment, if upheld, would support the court's judgment. *Artman v. Ray,* 263 Or 529, 532-34, 501 P2d 63, 502 P2d 1376 (1972); *St. Paul Fire & Marine Ins. v. Speerstra,* 63 Or App 533, 536, 666 P2d 255, *rev den* 295 Or 773 (1983). We hold against defendants on their cross-assignments.

[3] All references to statutes or administrative rules are to the versions which were in effect at the time of the events in this case.

skilled nursing services and at least one of several other services, of which home health aide service is one. Kelly was licensed when it provided care for Tuson. A CNA is not qualified to provide home health aide services, which require a HHA. Kelly argues that an HHA was not necessary for Tuson, because it was providing personal care, not home health care, and that personal care services are exempt from licensing. ORS 443.005(2)(c) exempts from the definition of "home health ·agency" "[t]hose personal care services that do not pertain to the curative, rehabilitative or preventive aspect of nursing." *See also* OAR 333-27-005(1).

■    Kelly claims that its employes simply assisted Tuson with her personal and household tasks and provided companionship; they acted, it says, as a substitute for family members. Kelly ignores a large amount of evidence to the contrary. A jury could readily conclude that the CNAs provided total care for a woman who could no longer think clearly or meet her basic needs. That care, a jury could find, included at least curative and preventive aspects of nursing. The aides regularly turned her to help cure her bedsores and to prevent new ones, they changed dressings and applied treatments to the sores and they made·sure that she took her medicine.[4]

■    Much of the seven-day trial was devoted to witnesses' views of what the statutes and rules require. Each party presented expert witnesses. Plaintiff's experts were state employes with experience in the administration of the licensing program. Defendants' expert was the administrator of a private home health agency. In part, the differences in their testimony reflect the different perspectives of those enforcing the act and those actually functioning under it. Industry views of the law's requirements seem to be based, in significant part, on the difficulty of finding HHAs willing to do 24-hour in-home care and on the extra costs to the agency and to the family for using HHAs. Those matters are for legislative consideration. Whatever the practicality of the law as plaintiff's experts construe it, that construction is consistent with its

---

[4] Defendants emphasize testimony that the CNAs simply substituted for the care a family member might have given. Even if true, that fact is irrelevant. No statute or rule requires family caretakers to be certified or limits the care which they may give.

language and its legislative history.[5] The trial court did not err in concluding that the law required Kelly to provide HHAs to Tuson.

Plaintiff alleged that Kelly's failure to fulfill its legal duty to provide HHAs was negligence *per se* in a number of respects. The court held that, with one exception, there was no evidence of a causal connection between the alleged negligence and Tuson's injury. It therefore submitted only the allegation that Kelly violated OAR 333-27-015 and OAR 333-27-050 by failing to provide home health aide service. Plaintiff assigns as error the court's failure to submit allegations that Kelly violated OAR 333-27-020 by delegating supervisory and administrative functions relating to Tuson's care to another organization; OAR 333-27-020(1) by failing to conduct conferences every two weeks with employes providing services to Tuson; OAR 333-27-020(2) by failing to conduct telephone conferences with those employes; and OAR 333-27-030 by failing to follow the physician's plan of treatment, which required HHA care.

■ ■ Defendant asserts that the court should not have submitted the allegation it did submit. We disagree. Because HHAs have additional training related to home rather than institutional care, including training relevant to home safety, the trial court correctly determined that the jury could have found that the use of CNAs rather than HHAs contributed to the causation of Tuson's injury. For the same reason, we agree with plaintiff that the court should have instructed on the failure to follow the physician's plan of treatment by using HHAs.[6]

■ Plaintiff's other assigned errors are based on OAR 333-27-020, which provides, in pertinent part:

"The organization, services provided, administrative control, and lines of authority for the delegation of responsibility down to the patient care level should be clearly set forth in writing. Administrative and supervisory functions shall not be delegated to another agency or organization and all services

---

[5] The legislative history that defendants provide indicates that the legislature intended to exempt personal care and homemaker services from regulations; a jury could find that the care Kelly provided Tuson went beyond those services.

[6] There was evidence that Tuson's physician did not specifically intend that Kelly use HHAs and that the use of CNAs, therefore, did not violate his instructions. That dispute was a matter for the jury.

not provided directly shall be monitored and controlled by the primary agency, including services provided through subunits of the parent agency. * * *

"Services provided by the agency staff working out of their individual homes within a portion of the geographic area served by a home health agency, shall not by virtue of this alone, be deemed to be services of a subunit, so long as these services are controlled, supervised, and evaluated by the home health agency, in accordance with written agency policy. Such policy shall, as a minimum, include:

"(1)   A conference at the home health agency office at least every two weeks with the supervisor to review the plan(s) of treatment.

"(2)   A telephone conference on at least a weekly basis between office conferences.

"(3)   Supervisor participation in the development of the plan of treatment.

"(4)   Procedures for submitting clinical and progress notes, summary reports, schedule of visits and periodic evaluation."

The rule forbids delegation of supervisory functions. There was evidence that the Kelly CNAs were confused about whether they were responsible to their Kelly supervisors or to the VNA nurses for Tuson's care and that the Kelly supervisors thought that VNA had primary responsibility for nursing care, including instructing the Kelly CNAs. One VNA nurse testified that she and a Kelly CNA had put chairs against Tuson's bed in an effort to keep her from getting out accidentally. That aide neither told her Kelly supervisors or other CNAs about what she did nor mentioned it in her chart notes. A jury could find that divided supervision contributed to Tuson's injury.[7]

---

[7] The evidence concerning the chairs came out during the cross-examination of one of defendant's witnesses, not during plaintiff's case-in-chief. It was, however, part of the record when the court struck the allegation in question, and the court should have considered it in determining the sufficiency of the evidence in support of the allegation. Before the adoption of ORCP, when a defendant presented evidence after the denial of a motion for an involuntary nonsuit, the court was required to examine the whole record, including evidence admitted during the defendant's case, in deciding a later motion for a directed verdict. *Dell v. K. E. McKay's Market,* 273 Or 752, 757-58, 543 P2d 678 (1975); *Ballard v. Rickabaugh Orchards, Inc.,* 259 Or 200, 203, 485 P2d 1080 (1971); *Hallco Manufacturing Co. v. Foster,* 47 Or App 369, 371, 614 P2d 148 (1980); *Reagan v. Certified Realty Co.,* 47 Or App 35, 37, 613 P2d 1075, *rev den* 289 Or 741 (1980). There is no indication that the legislature intended to change that rule

■ The remaining allegations are based on subsections (1) and (2) of the quoted portions of OAR 333-27-020.[8] Defendants argue that those provisions apply only to agency staff working out of their homes and that the CNAs worked out of Kelly's Portland office. The purpose of the rule, defendants assert, is to regulate home health agency services in rural areas, where the agency's clients might be scattered over a large area a considerable distance from its office. There is evidence that the CNAs who cared for Tuson often received their assignments by telephone and went to them directly from the CNAs' own homes. The only supervision they received from Kelly came in the two visits Kelly nurses made to Tuson's home. Although defendants appear to be correct about the primary purpose for the rule, it is not explicitly limited to rural areas. It serves a clear purpose in ensuring adequate supervision in all situations where aides do not come to the agency office every day. We hold that it applies to Kelly's services and that there was evidence which would permit the jury to find that Kelly did not comply with it. There was also evidence that Kelly's failure may have contributed to Tuson's injuries. The jury could have found that, with more frequent supervision, Kelly would have learned of the use of the chairs at the bedside, and would either have instructed the CNAs to take appropriate precautions or would have insisted on a bed with side rails. We therefore reverse on the first four assignments of error.

The trial court gave the following instruction on negligence *per se:*

> "There has been considerable evidence concerning the interpretation of Oregon state laws and administrative rules of the Oregon State Health Division. Much of this evidence relates only to questions of law that you do not need to consider in your deliberations. You should, however, be aware

---

when it adopted ORCP. Thus, a trial or appellate court, in considering a motion for a directed verdict, will base its decision on the record as it exists when the court decides. That rule also controls the striking of a specific allegation of negligence.

[8] The Health Division did not number the major paragraphs when it adopted OAR 333-27-020. That failure makes it difficult to determine the exact referents of the subsections. We can determine, however, that the first paragraph we have quoted is one unit and that the second paragraph and the four numbered subparagraphs are, collectively, a second unit. The quoted units are themselves distinct from the rest of the rule.

that under the regulations of the State Health Division defendant Kelly Health Care, Inc., was a home health agency, and employes performing the type of care administered to Mrs. Tuson are required to complete a health aide course, the curriculum of which is directed by the State Health Division. *You may take this State Health Division regulation into consideration in determining whether or not there was any negligence. The issue, however, is still that of negligence.* Did defendant do some act which a reasonably prudent person would not do, or fail to do something which a reasonably prudent person would do under the same or similar circumstances." (Emphasis supplied.)

The court also refused plaintiff's request that it give UJI 10.03.[9] Both of those actions were erroneous.

■■ When the legislature adopts a rule governing a person's conduct and that rule is intended to protect certain people from harm, the rule establishes the standard of care in a common law negligence action; non-compliance is negligence as a matter of law. *Shahtout v. Emco Garbage Co.,* 298 Or 598, 601, 695 P2d 897 (1985); *Stachniewicz v. Mar-Cam Corporation,* 259 Or 583, 586, 488 P2d 436 (1971). Of course, a defendant may show that it acted reasonably in violating the statute and thereby avoid liability. *Barnum v. Williams,* 264 Or 71, 78-79, 504 P2d 122 (1972). The uniform instruction appropriately combines these concepts. However, the instruction that the trial court gave is not a negligence *per se* instruction. The court should have told the jury that a violation of the rule was negligence unless Kelly showed that it acted reasonably. Instead, it simply said that the jury could take the rule into account in establishing the standard of care. That statement might be appropriate when a plaintiff is not within the class the rule was intended to protect, *see Shahtout v. Emco Garbage Co., supra,* but Tuson was within the protected class here.

---

[9] Uniform Jury Instruction 10.03 reads:

"In addition to common-law negligence, there is statutory negligence, which consists of the violation of a statute or ordinance that, for the safety or protection of others, requires certain conduct or forbids certain conduct.

"When I call your attention to any such statute or ordinance, a violation of that statute or ordinance by a party constitutes negligence in and of itself (unless you find from all the evidence that such party has established that [he] [she] was acting as a reasonably prudent person under the circumstances)."

■ Plaintiff next assigns as error the court's refusal to admit in evidence a description of defendant Gray's supervisory duties with Kelly and its directing a verdict in her favor. Even if the refusal to admit the description of Gray's duties was erroneous, the court correctly granted the directed verdict. Gray's personal involvement in the case was minimal, and there is no evidence that she was aware of any difficulty in keeping Tuson in bed. She did not have direct supervisory responsibility for Tuson's care; another Kelly nurse did. Although Gray participated in some of the decisions from which the jury could find that Kelly had violated the relevant rules, those rules do not make *Gray* negligent *per se* for any violations. There was insufficient evidence of Gray's personal negligence to justify submitting the case to the jury.

Plaintiff's final assignments of error attack the court's denial of her motions, made at the end of the trial, to amend the complaint to assert additional common law negligence claims against Kelly. Because we reverse and remand as to Kelly, we need not decide this assignment of error.

Affirmed as to defendants Gray and Kelly Services, Inc.; reversed and remanded as to defendant Kelly Health Care, Inc.